**ASSOCIATION OF CALIFORNIA WATER AGENCIES; State Water Contractors; Kern County Water Agency; Stockton East Water District, Plaintiffs–Appellees,**

and

**Oregon Natural Resources Council; Pacific Coast Federation of Fishermen's Associations; Institute for Fisheries Resources; Pacific Rivers Council, Intervenors,**

v.

**Donald L. EVANS, in his official capacity as Secretary, U.S. Department of Commerce; William Hogarth, Director, Assistant Administrator of Fisheries, National Marine Fisheries Service, in his official capacity; Robert Lohn, Regional Director, Northwest Region, National Marine Fisheries Service, in his official capacity, Defendants–Appellants.**

No. 03–15380.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 2004.

Filed Sept. 24, 2004.

Aaron P. Avila, Attorney, United States Department of Justice, Washington, DC, for the appellants.

Gregory K. Wilkinson, Best Best & Krieger LLP, Riverside, CA, for the appellees.

Before: HUG, ALARCÓN, and W. FLETCHER, Circuit Judges.

HUG, Circuit Judge:

This case involves contested attorneys' fees awarded to Plaintiffs under the Endangered Species Act ("ESA"). During the pendency of Plaintiffs' action, the result of other related litigation rendered the Plaintiffs' litigation moot. Plaintiffs' request for fees is based on the theory that their lawsuit was a catalyst to bringing about Defendants' voluntary change of conduct and Defendants' revised interpretation of Section 4(b)(2) of the Endangered Species Act.

Plaintiffs pursued this action against the Secretary of Commerce and the National Marine Fisheries Service ("NMFS") alleging that Defendants had violated various provisions of the ESA when the NMFS designated certain lands in California and in the Pacific Northwest as critical habitats without conducting an adequate economic impact analysis. The case was dismissed as moot, after Defendants had settled a separate, but related case in another district, resulting in a remand of the designations of the very same critical habitats at issue in this case. Plaintiffs filed a motion for attorneys' fees and costs, arguing that although this case had been dismissed as moot, bringing the suit still resulted in Plaintiffs having achieved their goals. Plaintiffs argued that because this action was a catalyst in Defendants' decision to voluntarily remand the designations in the other case

and a revised interpretation of ESA Section 4(b)(2), they are entitled to fees and costs pursuant to the fee-shifting provision of the ESA.

The district court agreed and awarded Plaintiffs $304,530 in fees and $13,211 in costs. Defendants appeal that award and argue (1) that the ESA's fee-shifting provision does not apply because this case was actually brought under the Administrative Procedures Act, rather than the ESA; (2) that even if the ESA's fee-shifting provision does apply, the Supreme Court's decision in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) precludes use of the catalyst theory and so Plaintiffs are not entitled to fees because there was no judicial resolution to their case; and (3) that the district court awarded unreasonable fees and costs.

We hold that the district court correctly found that the ESA's fee-shifting provision applied in this case because Plaintiffs brought this action to enforce the ESA. We further hold that the district court correctly applied the catalyst theory and did not abuse its discretion in the amount of fees and costs it awarded.

**Procedural Background**

Plaintiffs, Association of California Water Agencies, State Water Contractors, Kern County Water Agency, and Stockton East Water District filed the original action on August 3, 2000. Plaintiffs alleged that Defendants, the Secretary of Commerce, the Director of the NMFS, and the Regional Director, for the northwest region of the NMFS, (1) had failed to conduct a proper economic impact analysis prior to issuing a final rule ("Final Rule") designating critical habitat for nineteen Evolutionary Significant Units ("ESUs") of steelhead trout and salmon, (2) that such

failure was part of a pattern and practice of violating the ESA requirement of conducting a proper economic impact analysis prior to designating critical habitats, and (3) that Defendants had failed to prepare an Environmental Impact Statement ("EIS") as required by the National Environmental Policy Act ("NEPA"). Plaintiffs alleged that Defendants violated section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), when the Secretary[1] designated the critical habitats without first balancing the economic effects of the designation against the benefits of specifying the areas at issue as critical habitats.

Defendants answered, denying the allegations and moved for partial dismissal of Plaintiffs' complaint, contending that Plaintiffs lacked standing to challenge the critical habitat designation for thirteen of the ESUs; that the district court lacked jurisdiction under the ESA's citizen suit provision; and that a NEPA challenge was foreclosed under Ninth Circuit law. At a scheduling conference, both parties acknowledged that a legal dispute existed as to whether the Final Rule complied with Section 4(b)(2) of the ESA and the requirements of NEPA. Before the oral arguments were heard, Plaintiffs filed a Notice of Related Case, alerting the district court that the National Association of Homebuilders ("NAHB") had filed a case in the District of Columbia on December 1, 2000, which also challenged the Government's application of ESA § 4(b)(2) in designating critical habitat for the salmon and steelhead trout in the nineteen ESUs. Plaintiffs advised the district court that it was likely that their litigation would be resolved more quickly than the NAHB case and, that an interdistrict transfer was not warranted. Defendants neither disputed this

assessment nor did they ever request a transfer or consolidation.

The district court held a joint scheduling conference on January 11, 2001, and determined that the case would best be resolved through the filing of cross motions for summary judgment and did not rule on the motion to dismiss. The time for filing the motions for summary judgment was extended from July to September.

Plaintiffs filed their motion for summary judgment on September 13, 2001, and on September 14, 2001, Defendants filed a motion for voluntary remand of the Final Rule and a motion to stay summary judgment proceedings.

On January 31, 2002, the district court entered an order ruling that it had jurisdiction, and Plaintiffs had standing to challenge the critical habitat for six of the nineteen ESUs, as well as Defendants' interpretation of ESA § 4(b)(2). The court also denied Defendants' motion to stay the action and ordered Defendants to file an opposition to Plaintiffs' motion for summary judgment by March 4, 2002. Significantly, the district court stated in the order that "the defendants' decision to consider only the incremental economic effects of designating critical habitat, beyond the effects associated with the listing of the species, suggests that the defendants did not consider the economic impacts of the designations as required by ESA § 4(b)(2)."

Subsequent to that ruling, Defendants entered into a consent decree in the *NAHB* case to vacate and remand the Final Rule. On March 8, 2002, Defendants filed a motion in this action to stay proceedings because, upon finalization of the

---

1. "Secretary" as used in the ESA may be either the Secretary of the Interior or the Secretary of Commerce, depending on the species at issue. *See* 16 U.S.C. § 1532(15).

In this action, the relevant "Secretary" is the Secretary of Commerce, who in turn delegated the responsibility of administering the ESA to the NMFS.

*NAHB* consent decree, the instant case would be moot. On May 8, 2002, Defendants notified the district court in this action that the *NAHB* consent decree had been entered. Defendants then filed a motion to dismiss this case as moot. On August 15, 2002, the district court granted Defendants' motion and dismissed this action as moot.

On August 31, 2002, Plaintiffs filed a motion for attorneys' fees pursuant to the fee-shifting provision of ESA, § 4(b)(2), 16 U.S.C. § 1540(g)(4). The district court heard oral argument on that motion on October 28, 2002, and on December 30, 2002, the court granted Plaintiffs' motion and awarded Plaintiffs $304,530 in attorneys' fees and $13,211.26 in costs.

Defendants appeal that order and challenge the district court's award of fees and costs.

## Discussion

### I. Standard of review

"We review an attorney's fee award for an abuse of discretion. A district court abuses its discretion if its decision is based on an erroneous conclusion of law or if the record contains no evidence on which it rationally could have based its decision. We review the underlying factual determinations for clear error and review de novo any legal analysis relevant to the fee determination." *Fischel v. Equitable Life Assurance Soc'y,* 307 F.3d 997, 1005 (9th Cir.2002).

### II. ESA Fee Shifting

The Endangered Species Act states that "any person may commence a civil suit on his own behalf ... against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary." 16

U.S.C. § 1540(g)(1)(C). The Final Rule was enacted pursuant to 16 U.S.C. § 1533(b)(2). The Act further provides that "[t]he court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, *whenever the court determines such award is appropriate.*" 16 U.S.C. § 1540(g)(4) (emphasis added).

■ Defendants argue that the district court erred as a matter of law when it awarded fees pursuant to the ESA. They contend that Plaintiffs' suit was cognizable only under the APA because they assert that Defendants' duty is discretionary. However, Plaintiffs' claims under the ESA fall squarely within § 1540(g)(4). The Supreme Court has held in an analogous case that:

> [T]he terms of § 1533(b)(2) are plainly those of obligation rather than discretion: "The secretary *shall* designate critical habitat, and make revisions thereto, ... on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular areas as critical habitat." (Emphasis added.) It is true that this is followed by the statement that, except where extinction of the species is at issue, "[t]he Secretary *may* exclude any area as part of the critical habitat." *Ibid.* (emphasis added). However, the fact that the Secretary's ultimate decision is reviewable only for abuse of discretion does not alter the categorical *requirement* that, in arriving at his decision, he "tak[e] into consideration the economic impact, and any other relevant impact," and use "the best scientific data available." *Ibid.* It is rudimentary administrative law that discretion as to the substance of the ulti-

mate decision does not confer discretion to ignore the required procedures of decisionmaking.

*Bennett v. Spear,* 520 U.S. 154, 172, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In this case, as in *Bennett v. Spear,* Defendants had "the categorical *requirement* to take into consideration the economic impact or any other relevant impact" in the designation of critical habitat. The Final Rule having been enacted pursuant to section 1533(b)(2), the suit was properly brought under, and governed by, the relevant fee shifting provision of the ESA, 16 U.S.C. § 1540(g)(4).

The issue in the case brought by Plaintiffs was whether Defendants had fulfilled that required duty when they applied the so-called "incremental effects" analysis to determine the economic impact of designating critical habitats. The incremental effects analysis is premised on the idea that listing the species will have certain economic impacts that are not to be considered in evaluating the economic impact from the designation of the critical habitats. Under this analysis, if the designation of critical habitat results in no *additional* economic impact, and the Secretary ignores the economic impact attributable to the listing of the endangered species, the Secretary may determine that the designation actually results in no economic impact at all. Plaintiffs contended that this approach contravenes the requirements of § 1533(b)(2) because under it the Secretary does not perform a proper economic impact analysis of the effects of designating a critical habitat.

Clearly, Plaintiffs' action was brought under the ESA. More importantly, the action was brought to *enforce* the ESA. Plaintiffs contend that the action they brought was a catalyst in bringing about Defendants' changed interpretation of section 1533(b)(2) and the remand of the designations, and that attorneys' fees are therefore available under the ESA's fee-shifting provision.

### III. Application of Ruckelshaus and Buckhannon

The ESA allows for fee shifting "whenever the court determines such award is appropriate," 16 U.S.C. § 1540(g)(4). This language "was meant to expand the class of parties eligible for fee awards from prevailing parties to *partially prevailing* parties—parties achieving *some success,* even if not major success." *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 688, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) (emphasis in original). Although it was construing language in the Clean Water Act, the Supreme Court was clear that its analysis applied to identical language in other acts as well, including the Endangered Species Act. *Id.* at 682 n. 1, 103 S.Ct. 3274. This holding has led to the use of the "catalyst theory" in cases in which the plaintiff achieved its desired result "because the lawsuit brought about a voluntary change in the defendant's conduct." *Buckhannon Bd. & Care Home, Inc. v. W.V. Dep't of Health & Human Res.,* 532 U.S. at 601, 121 S.Ct. 1835.

In *Buckhannon,* the Supreme Court addressed the propriety of the catalyst theory in a case brought under the Fair Housing Amendments Act ("FHAA") and the Americans with Disabilities Act ("ADA"). *Id.* at 600, 121 S.Ct. 1835. The Court stated: "We cannot agree that the term 'prevailing party' authorizes federal courts to award attorney's fees to a plaintiff who, by simply filing a nonfrivolous but nonetheless potentially meritless lawsuit (it will never be determined), has reached the 'sought-after destination' without obtaining

any judicial relief." [2] *Id.* at 606, 121 S.Ct. 1835 (citation omitted). Defendants suggest that *Buckhannon* thus precludes the use of the catalyst theory in the instant case as well. We disagree. As explained by the Eleventh Circuit, *Buckhannon* does not preclude use of the catalyst theory in ESA suits. *See Loggerhead Turtle v. County Council of Volusia County,* 307 F.3d 1318 (11th Cir.2002).

The Eleventh Circuit explained that *Buckhannon* does not preclude use of the catalyst theory in statutes that provide for fee shifting "whenever ... appropriate" for three reasons. First, "there is clear evidence that Congress intended that a plaintiff whose suit furthers the goals of a 'whenever ... appropriate' statute be entitled to recover attorney's fees." *Id.* at 1325. The 1970 Senate Report for the Clean Water Act (incorporating the same "whenever ... appropriate" language) stated that "if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions." *Id.* (quoting S.Rep. No. 91–1196, at 38 (1970)). In addressing that same Senate Report, the Supreme Court held that "Congress found it necessary to explicitly state that the term 'appropriate' extended to suits that forced defendants to abandon illegal conduct, although without a formal court order...." *Id.* at 1326 (quoting *Ruckelshaus,* 463 U.S. at 686 n. 8, 103 S.Ct. 3274).

Second, because *Buckhannon* makes no reference to "whenever ... appropriate" statutes, and exclusively discussed the "prevailing party" language in the statutes

that the decision addressed, the Supreme Court's decision did not affect the "whenever ... appropriate" class of fee-shifting statutes. *Id.*

Finally, one of the policy reasons stated in *Buckhannon* for disposing of the catalyst theory in "prevailing party" cases was that mischievous defendants could not avoid liability for attorney's fees in a meritorious lawsuit simply by voluntarily changing their conduct, because "so long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case." *Id.* (quoting *Buckhannon,* 532 U.S. at 608–609, 121 S.Ct. 1835). The Eleventh Circuit pointed out that "[b]y contrast, citizen suits under the ESA may *only* seek equitable relief; damages are not available." *Id.* (emphasis in original).

■ We agree with the Eleventh Circuit and hold that although *Buckhannon* does preclude use of the catalyst theory for suits brought under statutes providing for fee shifting for a "prevailing party," the decision does not preclude use of the catalyst theory for suits brought under statutes like the ESA, which allow the court to award costs of litigation "whenever the court determines such award is appropriate."

## IV. Plaintiffs' Entitlement to an Award of Fees

■ "When, as here, a plaintiff does not win a final judgment on the merits, a two-part test determines whether that plaintiff nonetheless 'prevailed' for the purpose of receiving attorney's fees."

---

**2.** We have applied *Buckhannon* to cases involving the ADA, *Richard S. v. Dep't of Dev. Servs.,* 317 F.3d 1080,1085 (9th Cir.2003), the Civil Rights Attorney's Fees Awards Act, *Bennett v. Yoshina,* 259 F.3d 1097, 1100–01 (9th Cir.2001), and the Equal Access to Justice Act, *Perez–Arellano v. Smith,* 279 F.3d 791, 794 (9th Cir.2002). In all those cases, the fee shifting provisions used the "prevailing party" language rather than the "whenever ... appropriate" language.

*Greater L.A. Council on Deafness v. Cmty. Television,* 813 F.2d 217, 219 (9th Cir. 1987) (internal quotations and citations omitted). "First, in a factual inquiry, the District Court must determine what the lawsuit sought to accomplish and then determine whether it was accomplished by means of the suit. Plaintiffs need only have received some of the benefits they sought in the suit. There must, however, be some sort of clear, *causal relationship* between the litigation brought and the practical outcome realized."[3] *Id.* at 219–20 (internal quotations and citations omitted) (emphasis in original). We review for clear error the district court's factual finding of such a causal relationship. *Id.* at 220.

■ The district court found that the instant action did indeed "constitute[ ] a 'material factor' and play[ ] a 'catalytic role' in causing defendants to vacate and remand the final rule."[4] The court found that "the Complaint in this action and the process of this lawsuit were a catalyst to the negotiation and issuance of the Consent Decree in the *NAHB* litigation, along with the result in the Tenth Circuit decision and the case in the Arizona District Court." The district court further found that "[t]he results in these other cases, when conjoined with the imminence of summary judgment proceedings in this case, caused the Consent Decree, the issuance of which mooted this action."

We hold that the district court's findings on this issue are not clearly erroneous. Although the Government was contemplating a voluntary remand as early as August 2001, this was nearly four months *after* the district court had set the filing date for cross-motions for summary judgment in this case.[5] In addition, the Government's determination to seek a voluntary remand in this case was made on September 12, 2001, at which point the cross-motions for summary judgment deadline was less than two weeks away (September 24, 2001). Furthermore, the NMFS settled with the plaintiffs in the *NAHB* case only *after* the district court in the instant case issued its January 31, 2002 order allowing Plaintiffs' lawsuit to go forward.[6]

Therefore, although the NMFS may have agreed to the voluntary remand in the NAHB litigation, it is certainly reasonable for the district court to have found that Plaintiffs' prior action played a part in that result and that Plaintiffs "received some of the benefits they sought in the

---

**3.** In the second part of the two-part test, the legal inquiry, "the court must determine that the benefit achieved was required by law and was not a gratuitous act of the defendant." *Greater L.A. Council on Deafness,* 813 F.2d at 220. The district court stated that it was "undisputed by defendants that this second part of the test, i.e., that the benefit achieved was required by law and was not a gratuitous act of the defendant, has been satisfied." Defendants do not dispute this issue on appeal.

**4.** Plaintiffs essentially sought (1) a declaration setting aside the Final Rule designating the various critical habitats at issue, (2) an injunction prohibiting Defendants from adopting the Final Rule pursuant to NEPA, (3) an injunction prohibiting the Defendants from adopting the final rule pursuant to the ESA,

and (4) a declaration that the incremental approach to economic analysis was not in compliance with the ESA.

**5.** By order filed in April 2001, the district court set the filing date for cross-motions for summary judgment for September 10, 2001.

**6.** Although the January 31, 2002 order limited the instant action to just six of the original nineteen ESUs, it is still not clear error to find that the desire to avoid litigation in this action, even if only over six ESUs, spurred the NMFS to settle the *NAHB* case for all nineteen ESUs initially in dispute in this action, because both cases involved contesting the Secretary's interpretation of ESA § 4(b)(2) under the "incremental effects" approach.

suit" and that there was "some sort of *causal relationship* between the litigation brought and the outcome realized," *Greater L.A. Council on Deafness*, 813 F.2d at 219–20. Plaintiffs' action was the first to challenge the Secretary's "incremental effects" approach to these ESUs. Although Defendants point out that there were other reasons for the NMFS to voluntarily remand the Final Rule and to reinterpret ESA § 4(b)(2), they fail to show how the district court's finding that the instant action was also a catalyst in that decision was clear error.

 Defendants also argue that the amount of fees awarded to Plaintiffs is excessive and unreasonable. Defendants argue that, given the limited success of Plaintiffs, such fees are an abuse of the district court's discretion. We disagree and hold that the district court did not abuse its discretion in making the award. Although Plaintiffs did initially seek a remand of the Final Rule for nineteen ESUs, and though the district court's January 2002 order limited the instant action to just six of the ESUs, the final consent decree from the *NAHB* litigation remanded the Final Rule for all nineteen ESUs. The main thrust of Plaintiffs' litigation was the Secretary's erroneous interpretation of ESA § 4(b)(2), in its "incremental effects" analysis. This ultimately applied to all nineteen ESUs.

Finally, we disagree with Defendants that because they were required to pay the attorneys' fees for the *NAHB* plaintiffs, as well as the fees for Plaintiffs in this case, this results in the federal government paying two sets of plaintiffs' counsel for only one consent decree in violation of *Hensley*

*v. Eckerhart*, 461 U.S. 424, 433–34, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (holding that the district court should exclude hours not "reasonably expended" including redundant hours). Defendants misunderstand *Hensley*. The Supreme Court in *Hensley* was making the point that counsel seeking attorneys' fees must adhere to the ethical rules that apply to billing in private practice, such as avoiding double billing. *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. The Court indicated as much by stating that redundant hours must be excluded

> just as a lawyer in private practice ethically is obligated to exclude such [redundant] hours from his fee submission. In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Id.* (internal quotations omitted) (emphasis in original). It is not unreasonable to have several plaintiffs sue for the same relief.[7] Each plaintiff's attorney in such an action must avoid double billing, but the fact that each plaintiff hires her own counsel is not, in itself, double billing. Here Plaintiffs filed the first action and Defendants made no effort to consolidate the actions.

The district court adequately considered the time records presented by Plaintiffs. The court found that the hourly rate billed by Plaintiffs' lawyers was reasonable given the amount of experience of the lawyers, the average rate of lawyers in the area, and the complexity of the case. The court also found that the amount of hours spent was reasonable given the same factors.[8]

---

**7.** Had the NMFS settled the instant action early enough, it might have avoided the *NAHB* litigation and the award of attorneys' fees in that case. Plaintiffs' was the first filed.

Defendants made no effort to seek consolidation of the cases.

**8.** The district court did reduce somewhat the fees incurred by Plaintiffs in preparing the

Defendants presented no evidence to show that the district court clearly erred in any of its factual findings (i.e., the number of hours actually worked).

The court did not award excessive fees, and the fees it awarded were supported by time records. Therefore, we affirm the amount of the district court's award of attorneys' fees.

### Conclusion

For the reasons discussed above we affirm the district court's award of attorneys' fees and costs.

**AFFIRMED.**

sixty-day notice required by 16 U.S.C. § 1540(g)(2)(A) and in preparation of the original complaint. The court reduced the fees incurred by Plaintiffs by twenty-five percent.